IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RUTH WALLS** | : | |
| | : | **CIVIL ACTION** |
| v. | : | No. 24-0003 |
| | : | |
| **ABINGTON SURGICAL CENTER et al.** | : | |

**McHUGH, J.**                                                                                           December 9, 2024

**MEMORANDUM**

In 2010, Congress amended the Fair Labor Standards Act to provide important protections for nursing mothers in the workplace. The plaintiff in this case – a nurse at an outpatient surgical center – was hired with the express understanding that she would need to pump breast milk while on duty. She contends that she was not given the protections afforded by law and was ultimately terminated in retaliation for asserting her rights. With discovery now complete, the evidence does not suggest that her employer failed to extend reasonable accommodations, nor is there evidence that reasonably supports claims of discrimination or retaliation.[1] I am therefore obligated to grant the Defendant's Amended Motion for Summary Judgment.

---

[1] Evidence that may be properly considered by the Court does not include counsel's sleight of hand. Many citations in Plaintiff's Response Brief are not quotes from Ms. Walls' deposition testimony, but Attorney Bryson's recitation of the complaint's allegations, or a reference to counsel's questions rather than the witness' answer. For example, Plaintiff's brief states that "Ms. Sherman said Ms. Walls 'had to pump wherever she could find a space without privacy.' (*Id.* 64:20-22.)" Pl.'s Res. at 4, ECF 17. In fact, this quote refers to a question Attorney Bryson asked. When Ms. Walls was asked by counsel "Did she actually say the words: Without Privacy," Ms. Walls responded: "I don't remember." Walls Dep. 64:23-65:1. Counsel's presentation is misleading.

In Plaintiff's Response Brief, direct quotes citing to Ms. Walls' deposition were slightly altered without any brackets or parentheticals. *See, e.g.,* Pl.'s Res. at 7 (citing Walls. Dep. 85:4-18). And some purported quotes from deposition testimony contain *no* citations whatsoever. *Id*. at 23.

I will generously interpret this as a series of mistakes, but I remind counsel of his obligations under Federal Rule of Civil Procedure 11 and Pennsylvania's Rule of Professional Conduct 3.3: Candor Toward the Tribunal.

I.    **Factual Background**

The relevant record is as follows.  On October 6, 2022, Plaintiff Ruth Walls interviewed for a nurse position at Abington Surgical Center (ASC).  Walls Dep. 25:20-26:21, ECF 15-2.  During this interview, Ms. Walls informed her interviewer, ASC Assistant Director of Nursing Emily Sherman, that she had a baby and would need to take pumping breaks during work.  *Id*.  With full awareness of that need, ASC hired Ms. Walls, and she started working on October 24, 2022.  *Id.* Ex. 2.  At ASC, Walls was both a circulating nurse and scrub nurse, reporting directly to Sherman.  *Id*. 39:2-4, 18-21.  Walls primarily served as a break nurse, rotating into operating rooms (ORs) to give other circulating and scrub nurses breaks during surgery.  *Id*. 40:6-41:22.

   A. **Accommodations for Pumping Breaks**

After she was hired, Ms. Walls informed ASC that she needed to pump twice each day, once around 10:30-11:00 am and once around 2:30-3:00 pm.  *Id*. 24:12-21.  Walls kept daily notes about what time she pumped and the volume of milk expressed.  Pl.'s Res. Br. Ex. E, ECF 17-6.  According to Ms. Walls, her breaks were sometimes late and on several occasions she was asked to hurry up on her breaks.  Walls Dep. 67:23-68:2, 71:11-72:4.  Sometimes Walls had to remind her supervisor, Ms. Sherman, that she needed to be relieved so she could pump.  *Id*. 70:24-71:6.

Ms. Walls requested that ASC provide her with a patient room to have her "own designated room" exclusively for her use that no patient would be able to use.  *Id*. 67:2-16.  This request was denied by Ms. Sherman, because ASC "may need the room for the patients."  *Id*. 62:5-11.  Instead, ASC allowed Ms. Walls to use a windowless conference room in the back office for pumping.  *Id*. 52:22-53:18.  Walls was allowed to leave her pumping materials out in this room so she didn't have to set up and pack up her pump each time.  *Id.* 66:11-13.  Although Ms. Walls was unable to lock the door, she would hang up a sign that said "Please Do Not Disturb, Pumping in Progress."

*Id*. 53:7-54:11; *id.* Ex. 7.  Other employees would sometimes knock on the door to see if the conference room was in use.  *Id*. 54:18-57:14. Only twice did someone walk in on Ms. Walls when she was pumping – out of over a hundred pumping sessions.[2]  *Id*.

Four to five times during Ms. Walls' employment the conference room was not available during a pumping session.  *Id*. 60:4-13.  When the conference room was in use, Ms. Walls would either use Human Resources Director Laura McClinton's private office or a private patient room to pump instead.  *Id*. 60:16-24.  Walls concedes that she always had access to a private space to pump.  *Id*. 63:2-8

### B.  Events of January 27, 2023

January 27, 2023 was by all accounts a high-stress day.  Testimony shows that there were scheduling changes, communication issues, and staffing shortages that led to tensions in the OR.  Junkin Dep. 70:20-74:5, ECF 15-5; Walls Dep. 99:6-13.  That morning, a surgery performed by Dr. Francesca Delach was ready to start earlier than scheduled.  Junkin Dep 73:15-74:5.  Nursing Director Junkin asked Ms. Walls to help prepare for this surgery, but ten minutes later Walls had not yet headed towards the operating room.  *Id*.  Ms. Walls testified that Dr. Delach yelled at Ms. Walls multiple times for "disrupting her case" when Walls opened the door to check for orderlies or left to pump.  Walls Dep. 100:1-9.  According to Walls, Dr. Delach did not know "why [Walls] was leaving. She just didn't like the fact that [Walls] was leaving the room."  *Id*. 105:8-10.  During the surgery, Junkin allegedly told another nurse outside the room that "[Walls] would get [her] break when [she] gets it."  *Id*. 75:9-13, 99:1-100:9.  Junkin also yelled at Ms. Walls for being on

---

[2] Though at first Ms. Walls indicated that a third person, Barbara Haslam, also walked in on her, Walls later clarified that Ms. Haslam did not walk in on her but rather refused to leave the conference room when Haslam was already using it.  Walls Dep. 57:6-20.

her cellphone at work, not realizing that Ms. Walls was using it for work. *Id*. 100:23-101:8, 102:5-6.

After this surgery, Ms. Walls, Ms. Junkin, the Nursing Director, and Ms. Sherman, Walls' direct supervisor, all spoke to Human Resources Director McClinton. Dr. Delach had complained about Ms. Walls' performance to Junkin, claiming that Ms. Walls had been inattentive, sarcastic, and intentionally annoying during the surgery. Junkin Dep. 70:8-71:20. As a result, Junkin requested that Human Resources put Walls on a performance improvement plan (PIP) to help improve her time management, attention to detail, and collaboration, which Ms. McClinton proceeded to prepare. McClinton Dep. 32:9-34:20, 40:16-18, 41:4-7, ECF 15-4. Notably, however, after speaking with Ms. Walls, McClinton concluded that a PIP wasn't necessary because the issues "seemed more like a miscommunication as opposed to insubordination" on the part of Ms. Walls. *Id*. 31:10-14. In objective terms, there were no negative repercussions for Ms. Walls following the events of January 27th.

**C. ASC Terminates Ms. Walls**

Ms. Walls did not fare as well after problems arose during a surgery on February 24, 2023. That day, Ms. Walls briefly relieved Nurse Beck during a surgical procedure conducted by Dr. Brian Buinewicz – an independent surgeon who performed surgeries at ASC. Walls Dep. 111:20-112:9. While in surgery, Ms. Walls prepared a lidocaine solution for the patient, diluting a lidocaine-epinephrine mixture with saline solution from a bag. *Id.* 113:1-21. Beck returned and relieved Ms. Walls after the solution was prepared, but before the solution was injected. Beck Dep. 15:25-16:24, ECF 15-7. It is undisputed that the mixed solution should have had a volume of 200 cubic centimeters (ccs). But after 200 ccs of the mixed solution was injected into the patient, Dr. Buinewicz, Nurse Beck, and the scrub tech all noticed that there were an extra 50 ccs of the

mixed solution left over in the bowl. Buinewicz Dep. 15:7-17:4; ECF 15-1; Beck Dep. 15:25-16:24.[3] Based upon the extra mixed solution, as well as the amount of unmixed saline solution left over in the saline bag, Dr. Buinewicz concluded that Ms. Walls had made a medical error when mixing the medication. Buinewicz Dep. 15:7-17:4. Later that afternoon, Dr. Buinewicz sent an email to the Director of Nursing Junkin and Human Resources Coordinator McClinton. *Id*. Ex. 1. The email described the incident, concluded that Ms. Walls made "a major error with medications," and said that he did not want Walls to work in his operating room again. *Id*.

When immediately called back into the room, Ms. Walls denied that she mixed the solution incorrectly. Walls Dep. 118:14-22, 121:1-18. To this day, she maintains that she mixed the solution properly. *Id*.

After learning about Ms. Walls' alleged medical error from Ms. Sherman and Dr. Buinewicz, Nursing Director Junkin and Hospital Administrator Paul Lodge made the decision to terminate Walls. Junkin Dep. 15:12-18:4. According to Ms. Junkin, the medical error "was the only reason" they decided to fire her. *Id*. Ms. Walls received a termination letter on February 27, 2023, stating that the medical error was the reason for her termination. Termination Letter, Pl.'s Res. Br. Ex. I, ECF 17-10.

## II.    Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

---

[3] After the error was noticed, Sherman was called into the OR to investigate. Sherman Dep. 17:14-18:25, ECF 15-3. She also observed the extra 50 ccs of mixed solution. *Id*.

### III.  Discussion

#### A.  Count I: FLSA Protections for Nursing Mothers

This case falls under Section 4207 of the Patient Protection and Affordable Care Act, which amended Section 7 of FLSA and required employers to provide: (1) "a reasonable break time for an employee to express breast milk," and (2) "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk."  29 U.S.C. § 207(r).[4]  Section 207(r) does not require break time to be paid.  Courts are split as to what injuries are potentially compensable under this provision, and the Third Circuit has not addressed the issue, but I need not reach this question because Plaintiff cannot point to evidence showing that ASC violated either requirement.

##### 1.  *Reasonable Break Time*

Ms. Walls claims that ASC did not provide her with reasonable break time.  Compl. ¶ 60. The record does not establish this.  First, though it is undeniably important for nursing mothers to be able to pump at around the same time each day, the ability to pump at the *exact* same time each day is not a requirement of Section 207(r).  Walls requested that she needed to pump twice each day, once around 10:30-11:00 am, and once around 2:30-3:00 pm.  *Id*. 24:12-21.  Ms. Walls claims that she wasn't always relieved from her nursing duties to pump at the desired times.  *See* Pl.'s Res. Br. at 20; Walls Dep. 67:23-68:2. Yet Walls' personal record of pumping times shows that, although there were a few days when Walls pumped late or early, the vast majority of days she pumped within or close to her desired times.  Walls Dep. at Ex. 6.  A test of reasonableness must

---

[4] In December 2022, this section was fully repealed and replaced by the more expansive PUMP for Nursing Mothers Act.  *See* Consolidated Appropriations Act 2023, Pub. L. No. 117-148, 136 Stat. 4459 (2022). However, at all relevant times in this case, Section 207(r) was in effect.

necessarily take into account the realities of the specific workplace. ASC is a surgical center and Ms. Walls was an operating room nurse. The ebb and flow of surgeries and patient care cannot be confined to predictable periods of time. Given Ms. Walls' duties as a medical professional and the need for an operating room to be adequately staffed, one cannot reasonably conclude that the occasional minor adjustments to Ms. Walls' pumping break times amount to a violation of Section 207(r). Ms. Walls herself admits that "It is not necessarily that I wasn't able to pump," rather, her complaint is with "the difficulty in achieving that" by having to "remind Emily" Sherman that she needed to be relieved to pump. *Id*. 70:22-23. However, an employee having to occasionally remind a supervisor of their need to pump does not violate Section 207(r) in a setting where supervisors must constantly coordinate staffing needs across multiple ongoing surgeries, particularly where the reminder resulted in time to pump.

Ms. Walls also claims that she was occasionally rushed when pumping. Pl.'s Res. at 20. Plaintiff claims that her milk supply log "demonstrates that [Walls'] milk supply doubled after she was fired." Pl.'s Res. at 8. Plaintiff also claims that she expressed less milk while she was working at ASC because she didn't always have enough time to pump. Walls Dep. 144:23-146:6. But looking at Ms. Walls' pumping records,[5] it becomes evident that the primary cause of her milk supply increasing after leaving ASC is that she was pumping twice as often – three to four times a day, as opposed to two. *Id*. Ex. E. After leaving ASC, Ms. Walls' pumping volumes were typically 3.5-6 ounces for her late morning and early afternoon sessions. *Id*. This is the same range as when she worked at ASC. *Id*. Therefore, Ms. Walls' own records show that she was expressing a normal

---

[5] I interpreted these logs pursuant to Ms. Walls' testimony explaining what the entries meant. Walls Dep. 49:8-51:11.

amount of milk while pumping at ASC, undercutting her contention that she lacked an adequate amount of time to pump. Furthermore, Section 207(r) only requires employers to provide "reasonable" break time, and Ms. Walls does not allege that her break time was insufficient, only that she felt rushed and that she wanted more time to pump.

Most of Ms. Walls' testimony relating to issues with break timing specifically involve events that transpired on January 27, 2023, *see* Pl.'s Res. at 20, a day where there were scheduling changes, communication issues, and staffing shortages that led to tensions. Junkin Dep. 70:20-74:5. On this day, Director of Nursing Junkin purportedly said that Walls will get her break "when she gets it." Walls Dep. 99:4-13. Ms. Walls also testified that she was yelled at by another doctor for taking breaks that day. Nonetheless, Ms. Walls' pumping records clearly shows she took her two pumping breaks, one at 11:30 am and one at 2:30 pm, and that she was able to express 11 ounces of milk – one of the highest volumes she produced while at ASC. *Id*. Ex. E at 3. And on that day, Ms. Walls was not prepared to start early when she was asked to and had been chastised for being on her cellphone, leading the surgeon Dr. Delach to believe that Ms. Walls was being intentionally disruptive. *Id*.; Walls Dep. 99:4-105:10. The events of this single high-stress day – a day where Ms. Walls was able to take two breaks and express a normal amount of milk – is insufficient to allow a reasonable factfinder to conclude that ASC failed to provide her with adequate breaks.[6] And as set forth above, Ms. McClinton imposed no discipline but attributed the tumult to miscommunication.

---

[6] Of note, Plaintiff's Response Brief states that "Ms. Walls testified that Ms. Junkin was 'very mean' to her for the entire day *whenever* she asked to take a pumping break." Pl.'s Res. at 20 (emphasis added). Once again, this mischaracterizes the testimony, as Ms. Walls was specifically asked about the events that transpired on January 27. Walls Dep. 99:6-105:21, 137:1-7.

Therefore, Ms. Walls has failed to produce evidence that could allow a jury to reasonably conclude that ASC did not provide Ms. Walls with adequate breaks as required by FLSA.

   2. *Place to Express Milk*

The record likewise fails to show that Ms. Walls lacked an adequate place to pump under Section 207(r).  ASC routinely allowed Walls to use a windowless conference room to pump. Walls Dep. 52:22-53:18. Only four to five times during her employment was the conference room in use during a pumping session, and on such occasions Ms. Walls would either use Ms. McClinton's private office or a private patient room.  *Id*. 60:4-63:8.  Critically, Ms. Walls acknowledges that there was never a time where she did not have a private location to pump.  *Id*. 63:2-8. Ms. Walls requested that a patient room be converted for her sole and exclusive use, but ASC denied this request.  Walls Dep. 62:5-11, 66:22-67:16.  But the statute does not require an employer to consent to an employee's personal preference – it mandates a private space free from intrusion.  It bears mention that ASC is not a full-service hospital, but a far smaller outpatient center.  Converting a patient room for use by a single employee twice daily would be an extraordinary accommodation in a suburban office park setting.

Ms. Walls' FLSA claim is partially based on intrusions into the conference room.  Though Ms. Walls was unable to lock the conference room door, she would hang up a Do Not Disturb sign. *Id*. 53:7-54:11; *id*. Ex. 7.  This sign was highly effective: only twice out of over 140 pumping sessions (each lasting approximately 20-30 minutes) did somebody enter the room.  *Id*. 54:18-57:14; *id.* Ex. 7.  Nurse Weisel and Nurse Peterman accidentally walked in on Walls once each around Christmas time when the room was being used to store gifts.  Walls Dep. 56:3-11, 58:19-59:7.  There is no testimony that co-employees ever acted inappropriately.  *Cf. Lampkins v. Mitra QSR KNE, LLC*, 383 F. Supp. 3d 315 (D. Del. 2019).

FLSA requires employers to provide a pumping location that is "free from intrusion" but does not require that this room be secure or lockable.[7] Two accidental interruptions over Walls' 4-month employment does not establish that the room was insufficient to comply with Section 207(r). Similarly, Ms. Walls' testimony that approximately once a week – out of eight weekly pumping sessions – someone would knock on the door to see if the room was occupied *but did not enter* - does not amount to impermissible "intrusion." *Id*. 54:18-55-16. And though Ms. Haslam's alleged refusal to leave the conference room on occasion could be viewed as impolite, Ms. Walls testified she was always able to find other private locations to pump when the conference room was already in use. *Id*. 63:2-8.

Given this record, I discern no factual basis on which a jury could reasonably find that ASC failed to provide Ms. Walls with reasonable break times or an adequate place to pump.

### B. Counts II & V: FLSA and Title VII Retaliation Claims

Ms. Walls also claims that she was terminated in retaliation for taking breaks to pump and complaining about pumping conditions, in violation of FLSA and Title VII. Pl.'s Res. at 26. Because FLSA and Title VII[8] retaliation claims both use the same burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), I will analyze Count II

---

[7] The PUMP Act, which superseded the statutory provision governing this case, likewise requires a room "shielded from view and free from intrusion." Department of Labor guidance issued under the current Act instructs that using a conference room or manager's office with a "lock *or* appropriate signs" complies with the FLSA. U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet #73A (accessed Oct. 2024) (emphasis added).

[8] Discrimination claims related to pregnancy and lactation are considered discrimination "because of" sex and are therefore evaluated under Title VII's sex discrimination framework. *See Marzano v. Computer Science Corp., Inc.*, 91 F.3d 497, 506 (3d Cir. 1996).

10

(FLSA retaliation) and Count V (Title VII retaliation) in tandem. *See, e.g., Cononie v. Allegheny General Hosp.*, 29 F. App'x 94 (3d Cir. 2002).

In assessing retaliation claims, first the Plaintiff must establish a *prima facie* case of unlawful conduct. *McDonnell Douglas Corp.*, 411 U.S. at 802. For the purposes of this analysis, I will assume that Ms. Walls has met her burden. Next, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection [or termination]." *Id*. If an employer meets this burden, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

ASC has articulated a legitimate, nondiscriminatory reason for firing Walls – its conclusion that she committed a serious medical error. *See* Termination Letter, Pl.'s Res. Ex. I (stating that "we cannot make any compromises with patient safety. Incorrectly mixing medications is a safety concern that we cannot get past."). Ms. Walls disputes that she mixed the medication improperly, but that alone does not establish pretext. "To discredit the employer's proffered reason, [] the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. There is abundant record evidence that multiple ASC staff members reasonably believed that Ms. Walls had made an error when mixing the solution and fired her because of it. Walls must point to evidence that "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' ... and hence infer 'that the employer

did not act for [the asserted] non-discriminatory reasons.'" *Fuentes*, 32 F.3d at 765 (citations and emphasis omitted).

Ms. Walls has not met this burden. She claims that ASC "fabricated a reason to fire Ms. Walls." Pl.'s Res. at 9 (cleaned up). But such a fabrication would require four individuals – Dr. Buinewicz, the temporary scrub nurse, Nurse Beck, and Assistant Nursing Director Ms. Sherman – to lie about the amount of fluid they saw both left in the mixed medicine bowl and left in the saline bag. Dr. Buinewicz uses ASC for surgeries but plays no role in its administration. His email communicating his lack of trust in Ms. Walls was sent the same day as the incident, and he testified at length about the events in the operating room. Even if the error was unfairly attributed to Ms. Walls, the record is devoid of *any* evidence that could allow a jury to conclude that a scenario was concocted by four disparate individuals as an excuse to fire Walls because she needed pump breaks.

### C.  Count III: Title VII Disparate Treatment

Count III of the Complaint alleges that ASC discriminated against Ms. Walls because she was pumping, in violation of Title VII. Compl. ¶¶ 122-134. Title VII prohibits employers from discriminating against employees "because of their sex." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act clarified that "because of sex" includes discrimination based on pregnancy, childbirth, and "related medical conditions." 42 U.S.C. § 2000e(k). Thus, discrimination claims involving pregnancy – including claims related to lactation – are evaluated under the same legal framework as other Title VII intentional sex discrimination claims. *See Marzano v. Computer Science Corp., Inc.*, 91 F.3d 497, 506 (3d Cir. 1996).

In particular, Ms. Walls argues a disparate treatment theory of discrimination. "A disparate treatment violation is made out when an individual of a protected group is shown to have been

12

singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII." *E.E.O.C. v. Metal Serv. Co.,* 892 F.2d 341, 347 (3d Cir. 1990). Courts use the same *McDonnell Douglas Corp*. burden-shifting framework to assess disparate treatment claims under Title VII. *Id*.

Here, the adverse employment decision at the heart of the disparate treatment claim is Ms. Walls' termination from ASC. Assuming for purposes of analysis that Ms. Walls states a *prima facie* case, ASC has met its burden to articulate a legitimate, nondiscriminatory reason for firing Ms. Walls – a reasonable belief that she committed a medical error. As discussed above, Walls has failed to provide any evidence to show that ASC's justification for firing her was pretextual. Absent such evidence, no jury could reasonably conclude that ASC fired Ms. Walls because of her sex.

### D. Count IV: Title VII Hostile Work Environment

Ms. Walls also claims that ASC violated her rights under Title VII by subjecting her to a hostile work environment because of her sex. Although the record might support an inference that some of Walls' coworkers were discourteous or impatient, the evidence falls far short of the kind of pervasively abusive conduct required to prove a hostile environment.

Title VII prohibits harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, VSF v. Vinson*, 477 U.S. 57, 67 (1986) (internal citations omitted). Title VII is not intended as a "general civility code," and requires that "conduct must be extreme" to constitute the kind of "change in the terms and conditions of employment" the statute was intended to target. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted). To establish a *prima facie* claim for hostile work environment claim, Walls must show "(1) the employee

13

suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (internal citations omitted).

The Supreme Court has instructed lower courts "to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher*, 524 U.S. at 787–88 (internal citations omitted).

1. *Intentional Discrimination Because of Sex*

To establish a *prima facie* case, Walls must show she suffered intentional discrimination because of her sex. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination *because of* sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (emphasis added) (cleaned up). Though Ms. Walls refers to several instances where she was treated poorly while employed at ASC, it does not amount to discrimination *because of* sex.

For example, Ms. Walls' frustrations with her pumping break location and timing are not discrimination because of her sex. Ms. Walls makes no claim that the occasional interruptions while pumping in the conference room or the denial of her request to convert a patient room for her sole use were done intentionally because of her sex. Walls Dep. 55:1-9. And though Ms. Walls believed that Nurse Beck "was discriminating against her" by showing up late to give Ms.

14

Walls breaks because of her breaks to pump, *id.* 134:10-19, Ms. Walls' pumping record shows that Ms. Walls was almost always able to pump at around her normal break time.

Furthermore, the record does not support that the OR incidents on January 27 and February 24 had anything to do with Ms. Walls' lactation. In fact, Ms. Walls herself admitted that on January 27, Dr. Delach did not know that Ms. Walls was leaving the room to pump; Dr. Delach didn't want *anyone* leaving the OR for *any* reason. *Id*. 100:1-9, 105:8-10. This is not intentional discrimination because of sex. Other alleged mistreatment on January 27 occurred after Ms. Walls failed to adapt to a change in surgery schedule, was on her cellphone, and because Dr. Delach believed that Ms. Walls was intentionally disruptive in the OR. Similarly, the events of February 24 that led to Ms. Walls' termination involved a situation where medical staff reasonably concluded that Ms. Walls had made a medical error. Nothing about either of these encounters amounts to discrimination because of sex.

Ms. Walls states that she "felt like [she] was a burden because people thought that [she] was getting special treatment" because of her pumping breaks. Walls Dep. 71:3-6. This does not establish any intentional discrimination because of Ms. Walls' sex. In fact, the various accommodations Ms. Walls received because of her nursing indicate that ASC was not discriminating against her. There is other evidence on the record that ASC actively tried to accommodate Ms. Walls' needs as a mother. ASC allowed Ms. Walls to start an hour later – after surgeries had already begun – to accommodate daycare drop off times. *Id*. 29:6-30:6. Texts with Walls' supervisor show Ms. Sherman allowing Ms. Walls to arrive late for family issues, Sherman checking in about Ms. Walls' son's health and recommending pediatricians, Sherman confirming that someone will relieve Ms. Walls for a pump break, and Sherman relocating Ms. Walls' pump when the conference room was in use so that Ms. Walls could access it. *Id.* Ex. 8. ASC even

allowed Ms. Walls to leave her pump out in the public conference room so she didn't have to set it up each time. *Id*. 86:1-10.

Looking at all the evidence on the record, no reasonable jury could conclude that Ms. Walls experienced intentional discrimination because of her sex.

### 2. Severe or Pervasive

Even if Ms. Walls could establish that actions against her were motivated by hostility because of her sex, Ms. Walls still bears the burden of proving that those actions were so severe or pervasive that they altered the conditions of her employment and created an abusive work environment. *Meritor Sav. Bank*, 477 U.S. at 67. In this case, no reasonable jury could find that Plaintiff has met her burden on this element.

Title VII does not impose a general civility code in the workplace. *Oncale*, 523 U.S. at 80. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher,* 524 U.S. at 788 (internal citations omitted). The record shows that Ms. Walls was usually able to pump at or near her desired time, expressed a fairly consistent volume of milk, and always had access to a private room to pump in. Only twice did other staff walk in on her while pumping. The record therefore demonstrates that disruptions to Walls' pumping were neither severe nor pervasive. These interruptions may be rude and inconvenient, but they did not interfere with Ms. Walls' ability to be an OR nurse and did not amount to a hostile work environment.

Furthermore, the specific incidents where Ms. Walls was yelled at do not amount to severe or pervasive hostility. On January 27, 2023, Ms. Walls was chastised by both Nursing Director Junkin and Dr. Delach. But this was related to specific scheduling issues, failure to follow procedures in the OR, and cellphone usage during work. Walls Dep. 99:4-105:10; Junkin Dep.

16

70:8-71:20. Those chastisements and subsequent conversation with Human Resources – which did not result in discipline – are neither "severe" nor "pervasive" hostility. Similarly, the events that happened in the OR with Dr. Buinewicz on February 24 do not represent a pattern of discrimination creating a hostile work environment, but rather involve Dr. Buinewicz reasonably believing Ms. Walls had mixed a medical solution incorrectly.

"[C]onduct must be extreme to amount to a change in the terms and conditions of employment." *Caver*, 420 F.3d at 262 (citing *Faragher*, 524 U.S. at 788). The conduct that Ms. Walls describes – primarily issues with her pumping breaks and two non-pumping related OR incidents – does not meet the "severe and pervasive" standard required by *Meritor* as a matter of law. No jury could reasonably find that these actions amount to the level of pervasive prejudice, disparagement, and interference necessary to establish a plausible hostile work environment.

**IV.   Conclusion**

For the reasons set forth above, Defendant's Amended Motion for Summary Judgment will be granted on all counts. An appropriate order follows.


                                                             /s/ Gerald Austin McHugh
                                                            United States District Judge